COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Beales, Friedman and Callins
Argued by videoconference


MICHAEL D'ANGELO LAMBERT, SR.

                                                    MEMORANDUM OPINION[*] BY
v.         Record No. 1290-21-2                     JUDGE RANDOLPH A. BEALES
                                                    JANUARY 17, 2023

COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF HENRICO COUNTY
                            L.A. Harris, Jr., Judge

          Craig S. Cooley for appellant.

          Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
          Miyares, Attorney General, on brief), for appellee.


        The Henrico County Circuit Court convicted Michael D'Angelo Lambert, Sr., of unlawfully

shooting a firearm at an occupied building and of possession of a firearm by a convicted felon.[1]

Lambert challenges both of these convictions on appeal.

                                    I.  BACKGROUND

        "In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Scott v.*

*Commonwealth*, 292 Va. 380, 381 (2016).  As the Supreme Court has stated, "This principle

requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and

regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Lambert also pleaded *nolo contendere* to the charge of possession with intent to sell, give, or distribute marijuana.  That conviction is not before us on appeal.

drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

Lambert testified that he agreed to meet a man whom he did not actually know at the Lakefield Mews Apartment Complex ("Lakefield Mews") because the man wanted to purchase marijuana. On October 6, 2020, Lambert walked from his home to Lakefield Mews to conduct the marijuana sale.

Around 11:00 a.m. on October 6, 2020, a resident of Lakefield Mews ("the woman at the mailboxes")[2] had stopped near the mailboxes in Lakefield Mews to drop off some mail when she saw Lambert nearby and greeted him. Suddenly, she heard shooting and turned to see a man who had exited the passenger side of a white sedan firing at Lambert. She testified that Lambert fled toward the apartment building "that was adjacent to the mailbox"—specifically Building 4381. She then saw the shooter return to the passenger side of the vehicle and noticed the driver drive off towards a different area of Lakefield Mews. She testified that she did not see Lambert engage in any physical altercations or struggle with his attackers.

A woman who lived in Building 4381 ("the apartment resident") had been working from home that morning. She testified that she went to her kitchen around 11:00 a.m. to get a snack when "a bullet came through my refrigerator door while I literally had it open" and knocked her snack plate out of her hand.[3] Another bullet then entered her home through her living room window at the back of her apartment.

That same morning, a woman was walking her dog ("the woman walking her dog") in Lakefield Mews when she saw three men running towards "a white car parked in front of one of the

---

[2] In this opinion, we have attempted to simply describe the witnesses who lived in or near Lakefield Mews, rather than using their names, in an attempt to better protect their privacy.

[3] Detective Silcox testified at trial that the bullet that went "through the side of the refrigerator and out through the front door of the refrigerator" had entered the apartment resident's home through the front door of her apartment.

buildings." One of the men "was shooting a gun behind him." She saw the men get into that vehicle and drive out of Lakefield Mews, making a left onto the main road. She testified that the men in the white vehicle stopped shooting "after they were in the car." However, she did see a fourth person—a man carrying a blue bag—"walking through the field across the street from [her], leaving the complex as well, shooting a gun towards the street, towards the car" as it drove away.

When the Henrico County police arrived at Lakefield Mews, they searched the area. Officer Bowden testified that they found "a blue plastic bag and a black Glock handgun" with blood on it located in thick brush near the Lakefield Mews Apartments. The blue plastic bag contained "green leafy material" that was later determined to be approximately 7.5 ounces of marijuana. A DNA sample taken from the blood on the Glock was also later determined to be a match for Lambert.

The police also found numerous cartridge casings from several different firearms near Building 4381 and collected the two bullets that had entered the apartment resident's home. James Bullock, a forensic scientist firearms examiner who was qualified as an expert at trial, testified that the bullet that had entered the apartment resident's home through the back living room window had been fired from the Glock (the same firearm that was found with Lambert's blood on it). However, a different firearm had fired the bullet that had entered through the front door of the apartment. Upon examining the cartridge casings and bullets found in and around Building 4381, Bullock determined that at least three different firearms had been fired during the shootout.

At trial, Lambert admitted that he had possessed the Glock and the blue plastic bag containing marijuana that the police found in the brush near Lakefield Mews. He also admitted to shooting the Glock at the men in the white vehicle as they drove out of Lakefield Mews. However, he denied bringing the firearm with him to the marijuana sale. According to Lambert, while he was waiting to meet the man who wanted to purchase the marijuana, he received a call from the person he was supposed to be meeting. The caller informed Lambert that there were two men behind him

so Lambert walked toward one of the men. Lambert then turned and noticed another man behind him "running towards me with a firearm."

Lambert testified that he took off "running around the apartment [complex] that's when you know the chaos had broke loose, the shots was fired" and that he was then grabbed by an attacker and "started tussling and in the process of tussling, I got shot in my hand." According to Lambert, the man with whom he tussled dropped his firearm when both of them were fired upon by the other attackers. Lambert testified that he then picked up that firearm that the man had dropped. He was then shot in the right femur and grazed by a bullet across his forehead. According to Lambert, he was eventually able to run away but "passed out for a second" in a grassy area in front of Lakefield Mews. He also testified that, when he came back to consciousness, he noticed a white BMW "trying to leave the apartment" and started shooting at the men in the car because they were shooting at him. Lambert explained that this was the first time he had fired the Glock. He testified further that, after the BMW drove away, he disposed of the marijuana and the firearm and went to a relative's house, instead of a medical facility, to treat his own wounds—partially because he did not want to explain how he acquired the injuries.

At trial, Lambert made a motion to strike, arguing that the man with whom he tussled was the person who fired the bullet from the Glock through the apartment resident's rear living room window before Lambert took possession of that firearm during the tussle. He also argued that he only possessed the gun out of necessity. The trial court denied the motion to strike, finding that Lambert's testimony was inconsistent with other evidence presented in the case, finding that Lambert "was the one behind the building," and finding that the evidence showed that the bullet from the Glock "entered the building from behind it." Consequently, the trial court convicted

Lambert of unlawfully shooting at an occupied building and of possession of a firearm by a convicted felon.[4]

Following trial, Lambert filed a motion to set aside the verdict, which the trial court also denied. The trial court explained,

> If it was a situation where I accepted the fact that the Defendant was attacked and he took somebody's gun away from them to protect himself, I would not find him guilty of possession of a firearm after being convicted of a felony. . . . But I just don't accept that as being the case here.

This appeal followed.

## II. ANALYSIS

On appeal, Lambert challenges the sufficiency of the evidence to support his convictions. When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," *Riner v. Commonwealth*, 268 Va. 296, 330 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *Crowder*, 41 Va. App. at 663 (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Furthermore, "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004) (quoting *Archer v. Commonwealth*, 26 Va. App. 1, 12-13 (1997)).

---

[4] Lambert had been previously convicted of several felony drug distribution charges.

A.  Possession of a Firearm by a Convicted Felon

In Lambert's first assignment of error, he contends that "the trial judge erred in finding appellant Lambert was in violation as a felon knowingly and intentionally possessing a firearm as a non-violent felon even though the court acknowledged he was the 'victim of violence directed at him.'"  Lambert, a previously convicted felon, admits that he possessed a firearm during the shootout on October 6, 2020, but argues that his possession of the firearm "was justified and necessary."

The Supreme Court has recognized that a defendant can raise the defense of necessity against the charge of possessing a firearm after having been previously convicted of a felony.  *Small v. Commonwealth*, 292 Va. 292, 299-300 (2016).  In order to benefit from the defense of duress or necessity, the defendant must show: "(1) a reasonable belief that the action was necessary to avoid an imminent threatened harm; (2) a lack of other adequate means to avoid the threatened harm; and (3) a direct causal relationship that may be reasonably anticipated between the action taken and the avoidance of the harm."  *Edmonds v. Commonwealth*, 292 Va. 301, 306 (2016) (quoting *Humphrey v. Commonwealth*, 37 Va. App. 36, 45 (2001)).  "[T]he necessity relied upon must not arise out of defendant's own misconduct."  *Id.* (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)).  Furthermore, "[n]ecessity provides no defense to a charge of possession of a firearm by a convicted felon if the felon takes possession of the firearm before the threat becomes imminent or retains possession longer than required after the danger has passed."  *Humphrey*, 37 Va. App. at 50.

Relying heavily upon his own testimony, Lambert argues that he took possession of the Glock firearm "only when he wrested it free from one of his attackers who physically engaged him."  However, the trial judge explicitly and unequivocally rejected Lambert's account of how he gained possession of the firearm—stating that he simply did not accept that "the Defendant was attacked and he took somebody's gun away from them to protect himself."

- 6 -

The trial court, as factfinder in this case, was "not required to accept the self-serving testimony of the defendant . . . but may rely on such testimony in whole, in part, or reject it completely." *Carosi v. Commonwealth*, 280 Va. 545, 554-55 (2010); *see also Vasquez v. Commonwealth*, 291 Va. 232, 250 n.13 (2016) ("[E]ven if 'not inherently incredible'—a defendant's exculpatory version of events need not be accepted by the factfinder." (quoting *Montgomery v. Commonwealth*, 221 Va. 188, 190 (1980))). The factfinder has the sole responsibility to determine the credibility of the witnesses and the weight accorded their testimony. *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011). Here several witnesses, whose written statements were entered into evidence at Lambert's request, observed portions of the shootout between Lambert and his attackers. However, *none* of them reported seeing Lambert in a physical struggle or tussle with anyone.

Indeed, Lambert's testimony was inconsistent with that of other witnesses at trial. Contrary to Lambert's testimony that he only returned fire, the woman walking her dog testified that Lambert was shooting at the attackers even as they drove away from Lakefield Mews in their vehicle and even though the attackers had stopped doing any shooting "after they were in the car." Furthermore, the trial court was not required to accept Lambert's theory that a man had been lying in wait for him behind the building before the shootout began. This is true even though the woman at the mailboxes did not notice all three assailants. She saw the shooter and the driver. However, she never testified that there were *only* two people in the car at that time. Her attention at the time had understandably been on avoiding the shooter—not on the occupants of the white vehicle—and, in fact, she only noticed the driver as she was trying to take cover from the flying bullets. Thus, her testimony does not contradict the fair inference that the third assailant (that the woman walking her dog saw a few minutes later) could well have been in the vehicle at the beginning of the attack on Lambert. Consequently, we cannot say that the trial court was plainly wrong in rejecting Lambert's

account of how he came into possession of the firearm. *See Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010) ("Whether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong.").

Lambert admitted having possession of the Glock firearm and to firing it at the assailants as they left Lakefield Mews. His blood and DNA were also found on that firearm. Furthermore, Lambert admitted that he went to Lakefield Mews to sell marijuana to a man he did not know—a course of conduct he admitted was dangerous. *See Commonwealth v. Smith*, 281 Va. 582, 593 (2011) (recognizing that drug distribution offenses are "closely associated with firearms due to the danger inherent in the drug trade"). Therefore, a rational factfinder certainly could reasonably infer that Lambert brought the firearm with him to the drug sale, *see Jackson*, 443 U.S. at 319, and, consequently, that Lambert had possession of the firearm *before* the attack began, *Humphrey*, 37 Va. App. at 50.

Given the evidence in the record and given that the factfinder explicitly rejected Lambert's hypothesis of innocence, we certainly cannot say that no rational factfinder could have found the evidence sufficient to conclude that Lambert had possession of the Glock firearm and that he took possession of the firearm *before* his life was in imminent danger. *Id.* Consequently, we affirm Lambert's conviction for possession of a firearm by a convicted felon.

### B. Unlawfully Shooting at an Occupied Building

In his second assignment of error, Lambert contends that "the trial judge erred in finding the evidence was beyond a reasonable doubt as to the charge of shooting into an occupied building where the evidence established the defendant fired shots only in self-defense at multiple attackers shooting at him." Specifically, he argues that "[n]o witness could identify in whose hand the Glock had been when the bullet (item 18) was fired at the building, the third assailant or Mr. Lambert."

Code § 18.2-279 prohibits a person from unlawfully shooting at "any dwelling house or other building when occupied by one or more persons, whereby the life or lives of any such person or persons may be put in peril." Here, James Bullock, a forensic scientist firearms examiner, testified at trial that the bullet fired through the apartment resident's rear living room window into her apartment came from the Glock. Lambert admitted to possessing and firing that Glock during the shootout (although he claimed he never shot at the building, which the trial judge clearly did not believe). Furthermore, the trial judge, who was able to view the witnesses as they illustrated the events on a large map in the courtroom, found that Lambert "was the one behind the building," who had the ability to fire the bullet that went through the rear window of the apartment.

Indispensable to Lambert's hypothesis of innocence in this assignment of error is that someone other than Lambert also had possession of the Glock during the shootout and, therefore, also had the ability to fire that Glock into the apartment. However, as discussed in subsection (A) *supra*, the trial judge made a finding of fact that Lambert did not obtain the Glock in a tussle near the apartments, and the record supports the conclusion that Lambert possessed the Glock. Based on these findings of fact and these credibility determinations by the trier of fact, Lambert, consequently, was the only individual who could have fired the bullet from that Glock that entered the apartment through the living room window.

Therefore, for all of these reasons, we cannot say that no rational factfinder could have found the evidence sufficient to conclude that Lambert fired the bullet from the Glock in question into the apartment resident's home. Consequently, we do not disturb Lambert's conviction for unlawfully shooting at an occupied dwelling.[5]

---

[5] In Lambert's third assignment of error, he contends that "the trial judge erred in not granting the appellant's motion to set aside the verdicts for the reasons attributed in assignments of error I and II." Given that the trial judge did not err, as appellant claims, in determining that the evidence was sufficient for both convictions, we also affirm the trial court's denial of Lambert's motion to set aside the verdict.

## III.  CONCLUSION

For all of these reasons, we affirm the judgment of the trial court.

*Affirmed.*